Shirleen **LAWRENCE** and Jimmie Lawrence, Plaintiffs,

v.

**COURTYARDS AT DEERWOOD ASSOCIATION, INC., Miami Management, Inc., and Gisella Novillo, Defendants.**

No. 03–21614–CIVHUCK.

United States District Court, S.D. Florida.

May 11, 2004.

Amy R. Mosel, Gary Khutorsky, Robert M. Klein, Stephens, Lynn, Klein, LaCava, Hoffman & Puya, P.A., for Defendants, Courtyards at Deerwood Association, Inc., and Miami Management, Inc.

Cornelius Shiver, Law Offices of Cornelius Shiver, P.A., Coconut Grove, FL, for Plaintiffs.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING CLAIMS AND COUNTERCLAIMS

HUCK, District Judge.

THIS CAUSE is before the Court upon the Amended Motion for Summary Judgment [DE# 66] filed by The Courtyards at Deerwood Association, Inc. and Miami Management, Inc (collectively "Defendants") on March 22, 2004. The Defendants are entitled to summary judgment because the material facts are undisputed and the claims brought pursuant to the Federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Civil Rights Act ("CRA"), 42 U.S.C. § 1982, fail as a matter of law for several reasons.

## I. FACTS

The Courtyards is a private, residential development, consisting of a combination of town homes, single family homes and condominiums. The Courtyards at Deerwood Association, Inc. ("Association") is the homeowner association responsible for administering, managing and maintaining the community, including the common area property. The Association's powers derive from articles of incorporation and by-laws recorded in the public records of Miami–Dade County, Florida. The Association acts through an elected Board of Directors ("Board"), which typically consists of five members. The Association contracted with Miami Management, Inc. ("Property

Manager") to conduct the daily management and maintenance of The Courtyards.

The Plaintiffs, Jimmie and Shirleen Lawrence, are an African American couple who purchased a home at Courtyard 14 in July of 2000. Courtyard 14 is an ethnically diverse community consisting of thirteen town homes built in a u-shaped formation around a common courtyard. Other residents of Courtyard 14 included people of Eastern Indian, African American, Hispanic, and Caucasian descent. As property owners, the Lawrences became members of the Association, were obligated to pay monthly maintenance fees to the Association, and therefore rightly expected the Association to maintain the common areas.

The purchase and closing on the Lawrence home transpired smoothly. Shortly after moving in, however, they began experiencing problems with their next door neighbor, Gisella Novillo, whom the Lawrences contend started a racially based campaign to drive them out of the neighborhood. Over the next couple of years, the Lawrences and Novillo complained about each other on numerous occasions to the Property Manager and the Board. The Lawrences complained to the Property Manager that Novillo had left derogatory messages on the their car and fence, which were located in common areas; allowed her cats to roam freely on their private property; verbally assaulted them with reprehensible racial epithets and statements; and cut their television cable line. Some of the derogatory comments were made in the presence of the Lawrences' seven year old daughter. A mask similar to the one in the movie "Scream" was left on the hood of their vehicle. Dead rats appeared on their front steps and back patio.

The problem was not one sided, however. Novillo complained the Lawrences illegally parked in the handicapped spot, trespassed on her property, took pictures of her house, and threatened and harassed her.

One of the Property Manager's duties was to respond to complaints from residents. Usually, a complaint was addressed by sending a letter to the violating party. In response to the Lawrences' complaints, the Property Manager sent letters telling Novillo to stop posting personal signs and letters on common property and to keep her cats from roaming freely in the community. The Lawrences continually wrote to the Property Manager and attended Board meetings to complain about Novillo. They wanted the Association to stop Novillo's racial harassment, particularly that which occurred in the common areas of the community. Novillo also wrote letters, called, and stopped by the Property Manager's office to complain about the Lawrences. The Board and the Property Manager always responded the same to both parties—they would not become involved in a personal dispute between neighbors.

Clearly, both the Property Manager and the Board were aware of the conflict. In fact, the record indicates neither the Property Manager, nor the Board had ever encountered a neighbor-to-neighbor conflict of such magnitude. After consulting with attorney Carlos Triay, the Board and the Property Manager determined that neither entity had jurisdiction to control the neighbor-to-neighbor dispute between the Lawrences and Novillo. The Property Manager and two Board members testified there was simply nothing the Property Manager or the Association could do to resolve the conflict raging between the Lawrences and Novillo.

In February of 2003, after receiving complaints from the Lawrences and Novillo for approximately two years, the Board called a special meeting to address the problems. Attorney Triay attended the

meeting. The Lawrences were told that, according to the by-laws, neither the Association nor the Property Manager could intervene in a dispute that did not affect the entire community. Jimmie Lawrence responded that he would produce a petition from other residents stating that Novillo was a nuisance to Courtyard 14, but he never did.

In a further effort to investigate the problem, the Property Manager and Triay conducted a walk through and randomly interviewed some residents in Courtyard 14. The results of these interviews were inconclusive. Although most residents were aware of the problem between the Lawrences and Novillo, it was impossible to determine who was right. Moreover, and contrary to the Lawrences' representation, the residents interviewed did not believe Novillo was a nuisance to Courtyard 14. Thus, the conflict began and remained completely personal between the Lawrences and Novillo.

After the Board met in February 2003, at least three letters were sent to the Lawrences requesting all documentation they claimed would support their various contentions against Novillo. The documentation was requested so Triay could render a legal opinion on the matter. By the time the Lawrences received these letters, however, they had engaged counsel of their own and did not produce any documents. Instead, they filed this lawsuit in October of 2003.

On December 23, 2003, Novillo barraged Jimmie Lawrence with derogatory statements as he arrived home, only this time she also threatened to kill him. Fearing for their personal safety, the Lawrences moved out of Courtyard 14 before the end of the month. Ironically, Novillo moved to Washington D.C. since the inception of this lawsuit.

In Counts I and II of the Amended Complaint, the Lawrences claim the Association and the Property Manager allowed Novilla to create a racially hostile housing environment, which the Defendants then tolerated and ratified, in violation of §§ 3604 and 3617 of the FHA, and the CRA, 42 U.S.C. § 1982.[1] The complaint alleges the Association addressed the complaints and problems of white homeowners, but refused to protect the Lawrences' right to the quiet enjoyment of their property because they are African American. They seek monetary damages and a declaration that the Defendants had an obligation to stop the racial harassment. The Association and the Property Manager filed a motion for summary judgment, which is fully briefed.[2]

## II. STANDARD OF REVIEW

A summary judgment is proper only if the record before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). In *Celotex Corp. v. Catrett* the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

---

1. These same claims are asserted against Novillo in Counts I and II. Count III states a claim for assault against Novillo only.

2. Novillo, a *pro se* defendant, has not moved for summary judgment.

burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To prevail, the moving party must do one of two things: (1) show that the non-moving party has no evidence to support its case, or (2) present "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc); *Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1170 (11th Cir.1995). In making this determination, the court should consider all of the evidence in the light most favorable to the nonmoving party, with all reasonable inferences drawn in favor of that party. *Dibrell Bros. Intern., S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1578 (11th Cir.1994).

If the movant successfully discharges this initial burden, the burden shifts to the non-movant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-movant's case. *Young,* 59 F.3d at 1170. The non-moving party must do more than rely solely on its pleadings, and simply show that there is some metaphysical doubt as to the material facts. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ritch v. Robinson–Humphrey Co.,* 142 F.3d 1391, 1393 (11th Cir.1998); *EEOC v. Amego,* 110 F.3d 135, 143 (1st Cir.1997); *Thornton v. E.I. Du Pont De Nemours and Co., Inc.,* 22 F.3d 284, 288 (11th Cir.1994). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir.1997). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allen,* 121 F.3d at 646.

A mere "scintilla" of evidence in favor of the nonmovant, or evidence that is merely colorable or not significantly probative is not enough to meet this burden. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. *See also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment). Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989).

### III. LEGAL ANALYSIS

#### A. The Parties' Arguments

The Defendants raise several grounds for granting summary judgment on the FHA claims in Count I, as follows: (1) section 3604 applies only to discriminatory conduct that directly impacts the right to acquire housing, thus excluding the Defendants' alleged conduct which post-dated the purchase; (2) section 3617 prohibits only direct, intentional acts of discrimination and, therefore, the Defendants' alleged failure to act falls outside

the purview of the statute; (3) the Eleventh Circuit has never recognized a hostile housing environment claim; (4) there is no direct evidence the Defendants were motivated to tolerate a hostile environment because of an intent to discriminate; (5) the Lawrences have failed to prove the Defendants' proffered reasons for not taking action were a pretext for discrimination; and (6) there is no evidence to prove the Defendants ratified Novillo's conduct.

The opposition memorandum is not organized in a manner that makes it easy to frame the issues, but the Court perceives four arguments in support of the FHA claims under sections 3604 and 3617. First, the Lawrences argue the court must follow *Evans v. Tubbe*, 657 F.2d 661 (5th Cir.1981), which extended the FHA "beyond mere sales and rentals" of property, and then urge the court to recognize a hostile housing environment claim under sections 3604(b) and 3617 as courts in other jurisdictions have done. The second argument is the gravamen of the FHA

case. The Lawrences would impose a duty on the Defendants derived from the Association's publicly recorded Articles of Incorporation and By-laws.[3] They contend that because the Association had the power to impose rules and regulations, and because the documents afforded protection from nuisances and disturbances, the Association should have protected their right to quiet enjoyment of their home and common area property.[4] On the fourth argument, the Lawrences assert they have established evidence that the reasons proffered for not intervening were a pretext for a discriminatory animus.

The Lawrences have stipulated the section 3617 claim is an interference claim based solely upon the Defendants' alleged failure to act. They argue *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir.1991), holds that section 3617 regulates discriminatory conduct arising after the sale of a dwelling. From this holding, they contend the statute does not limit claims to violent acts and a jury may infer discriminatory intent from the fact that

---

3. The Lawrences rely on several provisions in the articles of incorporation and by-laws to establish a duty, as follows:

*Nuisances.* No noxious or offensive activity shall be carried on upon any lands within the Project, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the neighborhood.
Article II, Section 3.

*Disturbances.* No owner shall make or permit any disturbing noises on any Lot or in any Unit or Condominium Unit or do or permit anything to be done therein which will interfere with the rights, comforts or conveniences of other Owners....
Article XIII, Section 23.

*Enforcement.* The Association, or any Owner shall have the right to enforce, by a proceeding at law or in equity, all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provision of this Declaration.
Article XVI, Section 3.

4. The Association holds the power to adopt rules and regulations governing the conduct of the members, pursuant to Article VII, Section 1 of the Articles of Incorporation and By-laws. The Lawrences believe the Association should have done the following: (1) invite Miami–Dade County Team Metro to mediate the dispute as the Association had allegedly done to resolve disputes involving the peaceful living and enjoyment of white residents; (2) form a committee to look into the situation; (3) issue a policy statement against racial harassment similar to the position taken against a white male who had intentions of ousting the Board; and (4) invoke its authority to create a rule restricting racially offensive activity within the community and then enforce the rule by imposing a fine on Novillo or revoking her right to vote or use the common property. Although most of these suggestions do not involve passing a rule or regulation, the Court assumes, without deciding, that all of these suggestions would lie within the Association's authority.

Defendants did nothing to stop Novilla's racial harassment that continued for over two years.

Defendants contend the CRA claim in Count II fails for three reasons: (1) § 1982 does not apply because the alleged discriminatory acts do not relate to the right to buy or sell property; (2) there is no evidence that the Defendants' intended to discriminate; and (3) there is no evidence that similarly situated white residents were treated differently.

The Lawrences counter the arguments saying the evidence shows the Defendants failed to enforce the rules against Novillo, refused to act on complaints of racial harassment in the same manner as complaints not involving racial harassment, tolerated racial harassment, and treated complaints from white residents differently.

## B. Fair Housing Act Claims

■■■■ The FHA is "a comprehensive open housing law." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The purpose of the statute, as expressed by Congress, is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Thus, it is intended to promote "open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. New York City Housing Auth.*, 484 F.2d 1122, 1134 (2d Cir.1973). In order to achieve its purpose, the provisions of the FHA are to be construed broadly. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211–12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). Plaintiff relies on sections 3604 and 3617 for relief from the Defendants' alleged discrimination.

## 1. No violation of Section 3604

Plaintiff has sued under two subsections of 3604. Section 3604(a) states it is unlawful:

> [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). Section 3604(b) provides that is unlawful for a defendant:

> [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b).

■■ The Lawrences cite *Evans v. Tubbe*, 657 F.2d 661 (5th Cir.1981), for the proposition that the prohibition of section 3604 has been extended, in precedent binding on this court, beyond the sale and rental of housing. First, it should be noted that the central issue in *Evans* was whether the district court had subject matter jurisdiction to address plaintiff's claims. *Id.* at 662. The court determined that it did, without opining on whether plaintiff was ultimately entitled to recover under section 3604. *Id.* at 665. In that case, the defendant erected a locked metal gate across the road which passed through his land. He gave the key to the gate to all the white people who owned property along the road, but refused to give a key to Evans, thus completely preventing Evans from accessing and using her land. Evans also alleged that the defendant had threatened, intimidated and harassed her. *Id.* at 662.

*Evans* is easily distinguishable. Not only did it involve a claim of direct discrimination by the defendant, it also involved allegations of threats, intimidation and harassment by the defendant. None of these allegations are at issue with respect to these Defendants. Moreover, because the opinion does not address the merits of the case, it did not extend the prohibitions of section 3604 beyond the sale and rental of housing as the Lawrences contend. Hence, *Evans* is inapposite.

As the statutory language makes clear and, as recognized in *Gourlay v. Forest Lake Estates Civil Ass'n. of Port Richey, Inc.*, 276 F.Supp.2d 1222 (M.D.Fla.2003),[5] section 3604 applies only to discrimination related to the acquisition or sale and rental of housing. In *Gourlay*, the plaintiffs purchased a house and thereafter became foster parents. After receiving complaints from neighbors over the years about the plaintiffs' children, the homeowner's association sought declaratory relief in state court to determine its and the plaintiffs' rights under the deed restrictions. *Id.* at 1225–26. The plaintiffs sued the association and its vice president under the FHA for housing discrimination based on familial status, alleging the defendants denied them the use and enjoyment of their residence, constructively made their residence unavailable, discriminated against them in the provision of services, and coerced, intimidated, threatened, and interfered with their exercise and enjoyment of their housing rights. *Id.* at 1227. The court concluded that defendants were not liable for violations under section 3604, noting that the FHA was not intended as "an all purpose cause of action for neighbors of different races, origins, faiths ... to bring neighborhood feuds into federal court when the

dispute has little or no actual relation to housing discrimination." *Id.* at 1236.

The *Gourlay* court first examined section 3604(a) and concluded that it applies only to discriminatory conduct that directly impacts a plaintiff's ability to obtain housing "and not conduct that just allegedly interferes with the use or enjoyment of a dwelling *after* that dwelling is purchased." *Id* at 1230 (emphasis added). In *Gourlay*, as in this case, all alleged discriminatory conduct occurred after the plaintiffs had acquired their property. The court refused to extend this subsection to cover such conduct, stating that "Nothing in the language of section 3604(a) implies protection against alleged discrimination in the use or enjoyment of a dwelling years after a dwelling is purchased." *Id* at 1231. The *Gourlay* court also expressed concern that the plaintiffs' proposed interpretation—under which any discriminatory epithet made by any person could be actionable if it in any way restricted that person's use or enjoyment of their home—would potentially run afoul of the First Amendment:

> This Court chooses to avoid the serious constitutional questions raised by Plaintiffs' interpretation of section 3604(a), and instead interprets section 3604(a) more narrowly and requires some connection to or impact on the availability of housing.

*Id.* at 1232.

The *Gourlay* court then addressed plaintiffs' claim under section 3604(b) and found that section applied only in connection with the sale or rental of a dwelling. *Id.* at 1233. The court explained that the term "services," as used in this section, does not include rules, policies, or practices of a

---

**5.** After the *Gourlay* decision was published, it was withdrawn because of settlement. *See Gourlay v. Forest Lake States Civil Ass'n. of Port Richey, Inc.*, No. 8:02CV1955T30TGW,

2003 WL 22149660 (M.D.Fla. Sep.16, 2003). While this decision has no precedential value, it is squarely on point and the analysis is persuasive to this Court.

homeowner association. *Id.* at 1234. Because in *Gourlay,* as in this case, the alleged discriminatory conduct was not related to the sale or rental of the plaintiffs' dwelling, the court found that section 3604(b) did not provide any basis for relief. *Id.*

■ As stated in *Gourlay,* "the FHA was passed to ensure fairness and equality in housing ... not to become some all purpose civility code regulating conduct between neighbors." *Id.* at 1232 n. 14. Yet this is precisely how the Lawrences are attempting to use the FHA. Having been frustrated in their efforts to curb the offensive conduct of their neighbor, Novillo, having received no help from the Association or Property Manager, they ask this Court to step in and use the FHA to control their uncontrollable neighbor. As *Gourlay* and other courts make clear, that is not the purpose of the FHA.

Plaintiffs counter *Gourlay* citing cases from other jurisdictions which involve either direct discrimination or discrimination in the employment context. *See and c.f. N.A.A.C.P. v. American Family Mut. Ins. Co.,* 978 F.2d 287 (7th Cir.1992); *National Fair Housing Alliance, Inc. v. Prudential Ins. Co. of America,* 208 F.Supp.2d 46 (D.D.C.2002); and *United States v. Pospisil,* 127 F.Supp.2d 1059 (W.D.Mo.2000); *Woods v. Foster,* 884 F.Supp. 1169 (N.D.Ill.1995). None of these cases involved situations where either a homeowner's association or a property management company were found liable under section 3604 for failure to contain or control the conduct of one neighbor against another.

Other courts have similarly held that section 3604 of the FHA applies only to claims relating to the buying or selling or leasing of housing. *See Walton v. Claybridge Homeowners Ass'n., Inc.,* No. 1:03–CV–69–LJM–WTL., 2004 WL 192106, at *4 (S.D.Ind. Jan.22, 2004) (section 3604 prohibits discrimination associated with the sale or rental of housing); *United States v. Weisz,* 914 F.Supp. 1050, 1054 (S.D.N.Y.1996)(conduct that interfered with neighbor's enjoyment of their dwelling because of their religion did not implicate section 3604); *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n.,* 208 F.Supp.2d 896, (N.D.Ill.2002) (section 3604(b) claim dismissed in light of the allegation that plaintiffs owned their home before problems began).

This Court agrees that sections 3604(a) and (b) are limited to conduct that directly impacts the accessibility to housing because of a protected classification, such as race. *See Gourlay,* 276 F.Supp.2d at 1232, 1234. While this Court does not condone the comments and conduct of Novillo, the Defendants' failure to stop Novillo did not have any impact on the Lawrences' ability to purchase their home. Hence, the Defendants cannot be held liable under 42 U.S.C. § 3604.

### 2. No violation of Section 3617

■ Section 3617 makes it unlawful:

to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected under this section.

42 U.S.C. § 3617. To prove a claim under section 3617, a plaintiff must demonstrate that:

(1) a defendant coerced, intimidated, threatened or interfered; (2) with a(a) plaintiff's exercise of a right under Sections 3603–3606; (b) plaintiff's enjoyment of a housing right after exercise of that right; or (c) plaintiff's aid or encouragement to a protected person to

exercise or enjoy a housing right; (3) because of discriminatory animus.

*Gourlay,* 276 F.Supp.2d at 1235, *citing Sofarelli v. Pinellas County,* 931 F.2d 718, 721–23 (11th Cir.1991).

■ The Lawrences' have stipulated the section 3617 is only an interference claim. As discussed above, there is no claim under section 3604 because all of the alleged wrongful conduct arose after the Lawrences moved into their home. So section 3617 applies only if the Defendants refused to stop Novillo's conduct, which the Court assumes for purposes of this motion was racially motivated, because of the Defendants' own discriminatory intent that resulted in interference with the Lawrences' enjoyment of their home. The Lawrences suggest the Court interpret section 3617 as regulating any conduct which has the effect of interfering with the exercise of rights protected under the FHA. The Defendants argue section 3617 prohibits only overt, discriminatory acts that are intentionally directed to a protected plaintiff.

The case the Plaintiffs cite from this circuit is *Sofarelli v. Pinellas County.* That case involved several neighbors' efforts to prevent Sofarelli from moving a mobile home, which the Sofarelli contended was an unlawful interference with his right to obtain housing. *Id.* at 722. He sued the county and its sheriff for interference under section 3617 because they interrupted the move by blocking the high-

way with their vehicles. *Id.* at 722–23. The claim against the county and the sheriff was dismissed because Sofarelli admitted there was no evidence of racial motivation on the part of the sheriff. *Id.* at 723. More importantly, there was not allegation that the county or the sheriff had violated the FHA by failing to stop the neighbors' interference. *Sofarelli* is therefore inapposite to the Lawrences' claim against the Association and the Property Manager.

■ In addressing the word "interfere," the *Gourlay* court stated that such language "extends only to discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights." *Gourlay,* 276 F.Supp.2d at 1235.

> [O]n one side lie cross-burning, fire-bombing and other similarly overt discriminatory acts designed to intimidate, coerce, or interfere with housing rights. On the other side lie unfortunate skirmishes between neighbors, tinged with discriminatory overtones or occasional discriminatory comments. Nothing in the text of the FHA or the case law interpreting it indicates that Congress intended to federalize the latter type of dispute.

*Walton,* 2004 WL 192106 at *7.[6] A failure to act does not rise to the level of the egregious overt conduct that has been held

---

**6.** Other courts have similarly limited the application of section 3617 to only the most extreme or violent conduct. *See Whisby–Myers v. Kiekenapp,* 293 F.Supp.2d 845, 852 (N.D.Ill.2003) (detonation of explosive device simulator combined with racial epithets stated § 3617 claim); *Bryant v. Polston,* No. IP 00–1064–C–T/G, 2000 WL 1670938, at *3 (S.D.Ind. Nov.2, 2000) (allegations that defendants followed plaintiffs' friends into the woods with a shotgun, walking back and forth in the yard while displaying a shotgun, shooting a pistol into the water behind their home, and running over the foot of one of plaintiffs'

children with a boat trailer stated a claim under § 3617); *Johnson v. Smith,* 810 F.Supp. 235, 238–39 (N.D.Ill.1992) (allegations of cross-burning on plaintiff's lawn and breaking plaintiff's windows stated claim under § 3617); *Seaphus v. Lilly,* 691 F.Supp. 127, 139 (N.D.Ill.1988) (allegations of physical assault and attempted arson of plaintiff's home stated a § 3617 claim); *Waheed v. Kalafut,* No. 86 C 6674, 1988 WL 9092, at *1 (N.D.Ill.Feb.2, 1988)(allegations that defendant firebombed house, screamed racial epithets, and threw beer bottles and rocks constituted claim under § 3617).

sufficient to state a claim under section 3617. The Court concludes that to constitute actionable interference, in the absence of a violation of sections 3603–3606, the discriminatory conduct must be pervasive and severe enough to be considered as threatening or violent. *See Gourlay,* 276 F.Supp.2d at 1236. The Defendants argue that this test necessarily means section 3617 prohibits only direct and intentional acts of interference by a defendant, taken because of a discriminatory animus.

The Lawrences contend that because the Defendants were aware of Novillo's harassment they should have done something to prevent or curtail it, and that the Defendants violated section 3617 by refusing to do so. The argument is flawed for two reasons. First, the Defendants' failure to take action is not a "direct and intentional act of interference" unless the Defendants had a duty to stop Novillo's conduct. The Lawrences have provided no circuit law that remotely suggests the FHA imposes a duty on a homeowner association or property manager to intervene in a neighbor-to-neighbor dispute. Pursuant to the governing documents, an owner cannot permit an activity to be conducted on their property that will interfere with the rights, comforts or conveniences of other owners. It is also true that the Association has the right to enforce all conditions imposed by the governing documents and the obligation to maintain the common area property, but the documents do not prevent racial harassment by one neighbor against another or require the Association or Property Manager to intervene in a neighbor-to-neighbor dispute. *See and c.f. Reeves v. Carrollsburg Condominium Unit Owners Ass'n.,* No. CIV.A. 96–2495RMU, 1997 WL 1877201, at *8 (D.D.C. Dec.18, 1997) (holding FHA claim stated against association where bylaws authorized association to stop illegal conduct and expressly made any violation of local or federal law a violation of the asso-

ciation's rules). The Lawrences erroneously equate an owner's right to have the Association enforce existing rules with a duty to create a new rule. They then attempt to bootstrap a failure to meet the alleged duty into a violation of the FHA. While an alleged failure to act may be sufficient to prove a claim sounding in negligence or breach of contract, the Court does not believe it can sustain an interference claim under section 3617 on the unfortunate facts presented here.

█ The second reason the argument fails is because a reasonable jury could not find or infer that the Defendants' own actions directed toward the Lawrences were pervasive, severe, threatening or violent. In response to complaints from Novillo that the Lawrences were violating existing rules, the Defendants simply wrote letters telling the Lawrences to stop the violation, just as they did when the Lawrences complained about Novillo violating existing rules. At some point after the harassment had escalated, allegedly by both sides, the Defendants took further action. They consulted with legal counsel and investigated the Lawrences allegation that Novillo was a nuisance to the neighborhood by interviewing residents in Courtyard 14. When those interviews were inconclusive, the Defendants decided not to intervene and to stay their usual course of responding only to complaints, from either side, involving violations of the existing rules and regulations. Not only do the facts fail to establish that the Defendants directed any threatening conduct toward the Lawrences, these facts do not present even a scintilla of evidence from which a reasonable jury could infer that the Defendants refused to intervene or stop Novillo because of a racial animus.

Plaintiffs cite a number of cases, which actually support the Defendants' position. For instance, in *Michigan Protection &*

*Advocacy Serv., Inc. v. Babin*, 18 F.3d 337 (6th Cir.1994), the court affirmed summary judgment for both the seller and purchaser of a house who were sued under the FHA for denying the mentally disabled plaintiff equal access to housing. The court found that the actions of the defendant seller did not rise to the level of interference required under 3617 because the seller had no direct involvement in the transaction and there was no indication of a discriminatory animus. *Id.* at 347. In *Egan v. Schmock*, 93 F.Supp.2d 1090 (N.D.Cal. 2000), a case which involved claims of discrimination between neighbors, the court explained that Congress did not intend the FHA to cover all discriminatory conduct which interfered with an individual's enjoyment of his or her home:

> Plaintiffs ... request that the Court interpret § 3617 ... to cover any discriminatory conduct which interferes with an individual's enjoyment of his or her home. The Court concludes that Congress did not intend the FHA to reach so far. If Plaintiffs' construction were adopted, any dispute between neighbors of different races or religions could result in a lawsuit in federal court under the FHA. The few reported cases applying the FHA to neighbor disputes involve violent or threatening conduct designed to drive the victim out of his or her home.

*Id.* at 1093.

From a public policy perspective, the Court is also unpersuaded that the FHA should be interpreted to impose a duty or hold the Association liable for the conduct of a member resident. At best, application of the statute is unclear in this context and the Lawrences offer no support from legislative history. As a practical matter, none of the solutions they proffer—inviting a county agency to mediate the dispute, forming a committee of homeowners to review the situation, issuing a policy statement, imposing a fine, or revoking Novillo's right to vote or use the common area property—would have produced their desired result. Even the Lawrences themselves were unable to stop the harassment with the assistance of police power and the state court system. It is unclear, therefore, exactly what the Defendants could have done to stop Novillo's conduct.[7]

### 3. No Claim for Hostile Housing Environment

#### a. Cause of Action not recognized in the Eleventh Circuit

██ The complaint alleges the Defendants "caused Plaintiffs to experience a racially hostile housing environment." The Lawrences' legal theory is that the Defendants tolerated or ratified Novillo's racially motivated harassment by failing to stop it. The Eleventh Circuit has not recognized cause of action under the FHA for a hostile housing environment. This Court will not create one on the facts presented. But even if the cause of action is cognizable under the FHA,[8] summary judgment is appropriate because the evidence fails to establish discrimination.

██ The *Gourlay* court noted various decisions suggesting that discriminatory conduct, similar to that which has been held to support a hostile work environment, could also support a claim under the FHA. *Gourlay*, 276 F.Supp.2d at 1236 and

---

7. The Lawrences apparently obtained an injunction against Novillo in state court, which seems to have been the most viable remedy available. For some reason not reflected in the record, however, they did not seek to enforce the injunction in state court when Novillo continued to harass and threaten them.

8. *See, e.g., DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996); *Honce v. Vigil,* 1 F.3d 1085, 1090 (10th Cir.1993).

n. 29. To prevail under this theory, the Lawrences have to establish that race played some role in the conduct of these Defendants. *Sofarelli,* 931 F.2d at 723 (dismissing claims against the county and the sheriff where the plaintiff conceded there was no evidence of racial motivation). Discrimination may be proved directly with evidence that a discriminatory reason motivated the defendants, or indirectly with evidence of a prima facie case and evidence the Defendant's proffered explanation for the action taken is unworthy of credence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The record does not establish a discriminatory motive under either test.

### i. no direct evidence of discrimination

■ There is no direct evidence of discrimination. It is undisputed that the Defendants did not simply ignore the Lawrences every time they complained about Novillo. A number of their complaints were addressed. When the Plaintiffs complained about Novillo leaving signs on their cars and fence in the common areas, the Property Manager responded with a letter to Novillo and the signs stopped. When the Plaintiffs complained about the number of cats kept by Novillo, the Property Manager again responded with a letter.

When the Defendants did not act upon a complaint filed by the Lawrences, the reason for not taking action was justified by something other than the fact the Lawrences were African Americans. The Defendants did not respond to some of the Lawrences' complaints because they never responded to similar complaints by anyone. The Defendants did not respond to the complaint of racial harassment by Novillo because under the governing documents, and upon the advice of counsel, the Defendants had no power to interfere with or resolve personal disputes between neighbors. The undisputed and best evidence of the Defendants' even-handedness is that they also failed to respond to similar complaints of threats and harassment made by Novillo against the Lawrences. Although the Lawrences complained bitterly about Novillo, Novillo complained just as bitterly about them. The Lawrences admitted, however, that they were never investigated, cited or otherwise sanctioned by the Association or Property Manager because Novillo complained about them. The facts do not permit a reasonable jury to find that discrimination more likely than not motivated the Defendants to tolerate or ratify a racially hostile housing environment.

### ii. no indirect evidence of discrimination

Under the *McDonnell Douglas* test, the Lawrences have failed to adduce evidence of a prima facie case or pretext.

■ There is no evidence the Defendants treated similarly situated residents differently. Although the Lawrences identify several actions they believe the Defendants should have taken to stop the harassment, they cited no instance where any of the suggested measures were taken against another resident. The record establishes the Defendants never fined or sanctioned anyone for unneighborly conduct. There was no procedure or policy in place to address disputes between neighbors. At most, the governing documents gave the Association the power to implement certain rules, which might have been fashioned to address neighbor-to-neighbor disputes. According to the deposition testimony, however, neither the Association nor the Property Manager had ever faced a neighbor-to-neighbor conflict of similar magnitude in this community and so rules for dealing with this type of conflict had

never been promulgated. Plaintiffs have produced no evidence to show the Defendants ever enforced the by-laws or otherwise intervened in a situation on behalf of a white resident in response to a similar complaint.[9] The claim of differential treatment thus fails. *Scialabba v. Sierra Blanca Condominium No. One Ass'n.*, No. 00 C 5344, 2001 WL 803676, at *5 (N.D.Ill. Jul.16, 2001); *Hartman v. Greenwich Walk Homeowners' Ass'n., Inc.*, 71 Fed. Appx. 135, 137 (3rd Cir.2003). Absent evidence that a white resident was similarly situated to the Lawrences, but treated more favorably by the Defendants, the prima facie case required by *McDonnell Douglas* to prove discriminatory intent fails.

■■■ Even if the Lawrences had established a prima facie case, summary judgment is appropriate because they have not countered the Defendant's proffered, nondiscriminatory reason for tolerating Novillo's racial harassment. The evidence shows the Defendants did not interfere in the personal conflict between the Lawrences and Novillo—on either side's behalf—because under the existing structure of the Association, there was no process in place to do so. In addition, they had never responded to similar complaints for any other resident. The Defendants point out that they did more for the Lawrences than for Novillo. Following complaints about Novillo leaving personal notes, the Property Manager sent a letter to Novillo advising her that such conduct was in violation of the Association's rules. Similarly, when the Lawrences complained about Novillo's cats, the Property Manager sent a letter to Novillo advising her of the Association's rules with regard to the number of cats. However, when the Lawrences and Novillo each complained about harassment by the other, the Defendants—after consulting with an attorney, holding a special meeting and conducting an investigation—decided not to take sides. Following the special meeting and interviews with other residents in Courtyard 14 which were inconclusive, the Property Manager and Attorney Triay sent three letters requesting documentation from the Lawrences to support their allegations. The Lawrences chose not to respond to these requests. These facts unequivocally show the Defendants did not remain indifferent to the Lawrences' dispute with Novillo.

The Lawrences baldly assert the Defendants' reasons for not taking more action "have been rebutted by Plaintiffs as nothing more than pretextual explanations, masking discriminatory animus,"[10] but they do not expand the argument or cite to any record evidence to support this conclusion. The Court is not obligated to comb the record or fashion an argument that could be supported by the evidence. The unrefuted facts would not permit a reasonable jury to find the Defendants' decision to remain neutral was a pretext for racial discrimination.

### b. Cases From Other Jurisdictions

Virtually all of the cases from other jurisdictions cited by the Lawrences in support of a hostile housing environment claim are distinguishable because they involve either claims of direct discrimination, sexual harassment, and/or claims arising in

---

**9.** Although the Plaintiffs stressed that the Board had intervened in the dispute between Dale Haywood and Angel Fernandez, the evidence does not bear out the argument. At some point in 2000, Angel Fernandez attempted to remove the current Board of Directors. In the course of his attempts, Fernandez sent the Board a letter declaring that the Board had been recalled and declaring himself as the new president. The Association's attorney sent him a letter regarding his "overthrow" attempts. There is no evidence that the Board became involved in personal issues between Haywood and Fernandez.

**10.** Opposition memorandum at p. 11.

the employment context.[11] Since the Lawrences are claiming the Association or the Property Manager tolerated or ratified the discriminatory acts of another, the direct racial discrimination cases are not persuasive. The attempt to analogize this case to those involving sexual harassment in the workplace are equally without merit. The nature of the relationship between an employer and employee, and thus the employer's accountability in the workplace, is not similar to the type relationship between the Association and the Lawrences as members of the Association. Thus, the policy considerations for allowing an employer to regulate the conduct of its employees and the work environment are not the same as those that come to mind in determining whether a homeowner association or property manager should be held accountable for the conduct of private homeowners within a community. Accordingly, the Court is not persuaded by the employment cases.

The only case the Lawrences cite that is similar to the present action is *Reeves v. Carrollsburg Condominium Unit Owners Ass'n.*, No. CIV. A. 96–2495RMU, 1997 WL 1877201 (D.D.C. Dec.18, 1997). *Reeves*, however, is factually distinguishable. There an African American plaintiff alleged that a white neighbor threatened to lynch, rape, and kill her; made revolting and outrageous racist and sexist epithets; and wrote notes of a racist and sexist nature. *Id.* at *1. Plaintiff also alleged the defendant condominium association tolerated the actions of the white neighbor,

thereby depriving plaintiff of her rights under the FHA. *Id.* at *7. Significantly, in *Reeves*, unlike the present case, the association's by-laws specifically authorized the association to curtail conduct that contravened the law. *Id.* at *8. Furthermore, according to the by-laws in *Reeves*, a violation of local or federal law was also an automatic violation of the association rules. *Id.* Finally, and most importantly, in *Reeves*, all the alleged harassment between plaintiff and her neighbor was completely one sided. *Id.* at *1, 5–8. Thus, the defendant association was not faced with a dispute between two neighbors where both sides complained of threats and harassment. In *Reeves*, the association did not have to be the judge and jury in a dispute between feuding residents.

In the present case, the Defendants were faced with competing complaints of threats and harassment from both sides. Unlike *Reeves*, Novillo disputed the Lawrences' claims of threats and harassment and, in fact, Novillo leveled the same accusations against the Lawrences. The Association's own investigation failed to produce conclusive results. As a consequence, unlike in *Reeves*, the Defendants were put in the untenable position of having to take sides—something they were simply not equipped or empowered to do. *Reeves* is therefore inapposite.[12]

### C. Civil Rights Act Claim

#### 1. Failure to State a Claim

■ The Civil Rights Act provides that all citizens have the right to inherit, pur-

---

11. *See DiCenso*, 96 F.3d at 1004; *Honce*, 1 F.3d at 1085; *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987); *Williams v. Poretsky Management, Inc.*, 955 F.Supp. 490 (D.Md. 1996); *Beliveau v. Caras*, 873 F.Supp. 1393 (C.D.Cal.1995); *People v. Merlino*, 694 F.Supp. 1101 (S.D.N.Y.1988); *Grieger v. Sheets*, 689 F.Supp. 835 (N.D.Ill.1988); *Wil-*

*stein v. San Tropai Condominium Master Ass'n*, 189 F.R.D. 371 (N.D.Ill.1999); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

12. *Reeves* is also rejected to the extent it can be read to hold that a FHA claim can always be stated against an association for tolerating or ratifying a hostile housing environment.

chase, lease, sell, hold, and convey property. 42 U.S.C. § 1982. To establish a prima facie case, a plaintiff must allege facts to show that: (1) the plaintiff is a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned activities addressed in section 1982. *Cantu v. Nocona Hills Owners Ass'n.*, No. CA 7:00–CV–220–R, 2002 WL 67974, at *3 (N.D.Tex. Jan.11, 2002).

 In this case, the Lawrences have not alleged that they were deprived of the right to buy or sell property. All of their grievances arose as a result of the conflict with Novillo, after the subject property had been purchased without issue. The Civil Rights Act, like the FHA, was not intended as a springboard to bring neighbor disputes into a federal forum. *Stackhouse v. DeSitter*, 620 F.Supp. 208, 209, 211 (N.D.Ill.1985) (section 1982 should not be read so broadly as to encompass a black resident's claims that after his family exercised their right to rent an apartment free of racial discrimination, their neighbor attempted to drive them out of the previously all-white neighborhood through acts of violence and property damage); *Cantu*, 2002 WL 67974, at *4 (plaintiff's claim that he was discriminated in the conditions of housing could not survive summary judgment because section 1982 applies to the denial of housing because of race). Section 1982 was never intended to, and does not reach, every alleged racially discriminatory act that is somehow related to housing. *Stackhouse*, 620 F.Supp. at 209. So, as a threshold matter, the section 1982 claim fails as a matter of law because all of the conduct alleged in this case post-dates the Lawrences' purchase of their home.

## 2. No Proof of Discriminatory Intent

Even if the Lawrences could clear the threshold hurdle, the facts cannot support a claim under section 1982. As discussed in section B.3.a above, the evidence does not permit a finding that the Defendants discriminated. Although the Association does have the power to promulgate certain rules and regulations which could be used to "police" homeowners, it is undisputed that such rules and regulations were never implemented. Moreover, the Defendants never responded to similar complaints from any other resident. The Lawrences admitted that the Association had never fined or sued a unit owner (except for nonpayment of fees); prevented an owner from voting; or ever restricted an owner's use of common areas. In addition, the Association had never formed a committee to deal with a neighbor-to-neighbor dispute, or even circulated a general letter regarding un-neighborly conduct. Consequently, there is no evidence to establish that the Defendants' tolerated or ratified Novillo's harassment because of a discriminatory intent.

## 3. No Proof of Similarly Situated Comparators

Apart from their own complaints about Novillo, the Lawrences have failed to prove even one instance where the Defendants took action when a white resident complained about similar conduct by a neighbor, as discussed in Section B.3.a.ii. The Lawrences cannot establish a prima facie case of differential treatment without showing that similar actions were taken on behalf of white residents. *Hartman v. Greenwich Walk Homeowoners' Ass'n., Inc.*, 2003 WL 21783758 (3rd Cir. Aug.4, 2003) (summary judgment for defendant condominium association was proper where plaintiff failed to show different treatment of similarly situated white resident).

## 4. Cases From Other Jurisdictions

The Lawrences rely on cases from other jurisdictions which are either legally or factually distinguishable. Reliance on

*Concerned Tenants Ass'n v. Indian Trails Apts.,* 496 F.Supp. 522 (N.D.Ill.1980), is misplaced because that case involved a claim of direct discrimination. Similarly, *Bradley v. Carydale Enterprises,* 707 F.Supp. 217 (E.D.Va.1989), is inapplicable on its facts.

In *Bradley,* the defendant landlord failed to address and resolve a black plaintiff's complaints about her white neighbor while at the same time responding to the white neighbor's complaints. *Id.* at 224. In *Bradley,* the apartment complex's standard procedure was to investigate and resolve all tenant complaints, and the governing lease documents specifically provided for the immediate removal of any tenant engaging in objectionable conduct which infringed the rights of other lessees. *Id.* at 219. On a motion to dismiss, the court accepted as true the allegation that the landlord failed to investigate and resolve the complaint of racial harassment. *Id.* at 224.

The circumstances here are distinguishable from those in *Bradley.* Apartment complex landlords are able to exert far more control over their tenants than a voluntary board of directors can exert over property owners. Tenants may be evicted; homeowners may not. Moreover, unlike the specific lease terms in *Bradley,* there were no documents here which specifically authorized the Association or the Property Manager to sanction, much less remove, Novillo for her offensive conduct. Finally, unlike in *Bradley,* the Defendants did undertake various efforts to address the problem, but ultimately had legitimate reasons for not taking sides.

## IV. DISMISSAL OF CLAIMS AGAINST NOVILLO AND NOVILLO'S COUNTERCLAIMS AGAINST PLAINTIFFS

The Lawrences have willingly refused to comply with the Court's orders regarding pretrial procedures and requirements. According to counsel for the Association and the Property Manager in the certification filed April 28, 2004, their counsel failed to meet to discuss and refused to file a joint pretrial stipulation with the Association and Property Manager. In addition, he did not participate in filing proposed joint jury instructions and failed to appear at calendar call. Finally, the Lawrences have failed to file a list of witnesses and exhibits to be used at trial. They are, therefore, precluded from presenting any evidence at trial. So, for these additional reasons, the case against the Association and Property Manager should be dismissed. The case against Novillo will also be dismissed because the Lawrences failed to comply with the same pretrial procedures with respect to the claims against Novillo in Counts I, II, and III.

Novillo's counterclaim against the Lawrences will be dismissed as well. She also failed to file the joint pretrial stipulation or jury instructions, failed to appear at calendar call, and failed to list any witnesses or exhibits to be used at trial.

## V. CONCLUSION

For all of the reasons stated above, the Lawrences' remedy does not lie with the Association Property Manager. The Motion for Summary judgment [DE# 66–1, –2] is GRANTED in favor of the Association and the Property Manager and the complaint is DISMISSED.

For the reasons stated in Section IV, the Lawrences' complaint against Novillo, and Novillo's counterclaim against the Lawrences, are both DISMISSED.